**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**CATHERINE BURNS**

          **Plaintiff,**          **CIVIL ACTION NO. 06-CV-12339-DT**

  **vs.**                  **DISTRICT JUDGE MARIANNA O. BATTANI**

**COMMISSIONER OF**        **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

          **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

**I.**    **RECOMMENDATION**

This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 20), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 18), and that Plaintiff's complaint be **DISMISSED**.

**II.**    **PROCEDURAL HISTORY**

This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act.  42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Catherine Burns filed an application for Disability Insurance Benefits (DIB) on August 23, 2002.  (Tr. 45-48).  She alleged she had been disabled since May 23, 2001 due to a back impairment, fibromyalgia, and depression.  (Tr. 45-48, 60).  Plaintiff's claims were initially denied in December 2002. (Tr. 30-36).  Plaintiff sought a review hearing before an Administrative Law Judge (ALJ).  (Tr. 37).  A hearing took place before ALJ John A. Ransom on October 18, 2004.  (Tr. 404-424).  Plaintiff was represented at the hearing.  (Tr.  26, 29, 406).  The ALJ denied Plaintiff's claims in an opinion issued on January 26, 2005.  (Tr. 15-25).  The Appeals Council denied review of the ALJ's decision on May 4,

2006 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 6-14). Plaintiff appealed the denial of her claim to this Court and both parties have filed motions for summary judgment.

III. **MEDICAL HISTORY**[1]

The records show that Plaintiff had a history of fibromylagia and back pain. (Tr. 105-19, 246-47, 293-96). In late April 2001 Plaintiff's primary care physician, Dr. Gregorio Imperial, Jr., referred Plaintiff to Dr. James Culver for her complaints of radiating lower back pain. (Tr. 197). In May 2001 Plaintiff reported to Dr. Culver that the pain fluctuated but was aggravated by standing, walking, sitting, other physical activities, and sometimes lying down. She also told Dr. Culver that physical therapy and chiropractic manipulation had not helped and that she received temporary relief with a TENS unit and heat. (Tr. 121). Dr. Culver reviewed an MRI taken of Plaintiff's lumbar spine in February 2001 and noted that it showed a small central disc herniation with mild degenerative changes at L5-S1 with minimal effacement of the thecal sac. *Id.*

An examination revealed that Plaintiff could ambulate without assistance but she moved slowly and deliberately as if in pain. Dr. Culver did not observe a limp. Plaintiff was able to rise up on her tiptoes but stated that it was too difficult to walk in that position. Dr. Culver noted that he was not convinced that any actual motor deficits existed. Plaintiff's reflexes were intact and symmetrial. She had a mildly limited range of lumbar mobility. Plaintiff exhibited hypersensitivity to pin prick testing but no area sensory loss was noted. A straight leg raising test was positive and there was lower back tenderness.

---

[1]     The record contains information regarding Plaintiff's mental health treatment. However, Plaintiff has not challenged the ALJ's findings as to her mental impairments. Therefore, those records are not discussed herein.

-2-

Dr. Culver diagnosed Plaintiff with small central disc herniation at L5-S1 with symptoms of sciatica.  He noted, however, that there was no convincing clinical evidence of lumbar radiculopathy. Dr. Culver recommended that Plaintiff undergo a series of caudal epidural steroid injections.  (Tr. 121-122, 196, 198).  After Plaintiff had completed her series of injections, Dr. Culver reported that Plaintiff had a 20-30% improvement in her back pain, which was less than Dr. Culver had expected.  (Tr. 196).

On September 18, 2001 Plaintiff was examined by Dr. Mokbel Chedid, a neurosurgeon, for her back pain.  (Tr. 236-38).  Dr. Chedid noted that he found Plaintiff laying on a stretcher when he entered the office to examine her.  (Tr. 237).  Plaintiff informed Dr. Chedid that this position was very comfortable.  Upon examination, Dr. Chedid found that Plaintiff had no motor deficits and full muscle strength in all extremities with mild weakness of the iliopsoas muscle.  *Id.*  There was no muscle atrophy and she had normal muscle tone.  Plaintiff's reflexes and sensation were intact.  A straight leg raising test was negative although there was a mild limitation in bending.  Plaintiff's gait was normal.  *Id.*

Plaintiff told Dr. Chedid that she was miserable and wanted something done to stop her pain. Dr. Chedid noted that Plaintiff's pathology was not severe so he did not recommend surgery at the time. He instead recommended that Plaintiff have a discogram and advised Plaintiff to see him again once the results from that test were available.  (Tr. 238).

Plaintiff subsequently underwent a discogram and a CT scan on September 21, 2001, which showed a large posterior annular tear that extended into the posterior disc margin at the L5-S1 level. Plaintiff rated her pain at this level at a 9 out of 10 in severity.  There was also a small tear at the L4-L5 level.  (Tr. 123-25).

Plaintiff saw Dr. Chedid in December 2001 and they discussed treatment options for her back, which included continued conservative management or elective surgery.  (Tr. 234).  In January 2002 Plaintiff underwent an elective anterior lumbar interbody fusion with iliac bone graft on January 23,

2002.  She was discharged in stable condition on January 26, 2002.  (Tr. 126-39).  Plaintiff thereafter received physical therapy three times a week.  (Tr. 152-67).

An MRI was taken of Plaintiff's cervical spine in March 2002.  The MRI showed degenerative disc changes at C4-C5 and C5-C6 with narrowing of the right neural foramina and a small osteophyte at C3-C4 with no foraminal compromise.  (Tr. 244).  In July 2002 Dr Chedid re-examined Plaintiff.  Plaintiff reported that she still experienced back pain.  (Tr. 233).  CT cans and x-rays showed that Plaintiff's operative changes were stable with no nerve root compromise.  (Tr. 233, 239-42, 245).

Plaintiff returned to Dr. Culver in September 2002 for continuing lower back pain.  (Tr. 190-92).  Plaintiff reported that her back surgery had helped somewhat but that she still had residual back pain that radiated to the right buttock and thigh and occasionally to the right calf, foot, and ankle.  Plaintiff also stated that she had leg muscle weakness, numbness, and spasms.  (Tr. 190).  An examination showed that Plaintiff could ambulate unassisted but had an antalgic gait and a right-sided limp.  Plaintiff was able to walk on heels and tiptoes with difficulty and pain.  (Tr. 191).  Her lumbar mobility was restricted.  No sensory loss abnormalities were detected and Plaintiff's reflexes were intact and symmetrical.  A straight leg raising test was mildly positive bilaterally.  *Id.*  Dr. Culver recommended another series of caudal epidural steroid injections.  (Tr. 192).

In October 2002 Dr. Culver reported that Plaintiff had completed her series of epidural injections and had obtained only a 20% improvement in her back pain.  (Tr. 188-89, 195).  Dr. Chedid also saw Plaintiff in October.  Plaintiff informed Dr. Chedid that her epidural injections were helping but she still had back pain.  Dr. Chedid noted that Plaintiff would likely not be able to return to work even with restrictions because of her multiple physical problems.  (Tr. 230, 232).

In November 2002 a state agency physician reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment form.  (Tr. 199-206).  The physician

-4-

concluded that Plaintiff could: (1) lift/carry 10 pounds occasionally and less than 10 pounds frequently; (2) stand/walk for at least 2 hours in an 8-hour workday; (3) sit for about 6 hours in an 8-hour workday; (4) push/pull without limitation; (5) climb ramps or stairs occasionally; (6) never climb ladders/ropes/scaffolds; and (7) occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 200-01). The physician did not believe that Plaintiff had any manipulative hand limitations. (Tr. 202).

Plaintiff returned to Dr. Chedid in March 2003 for a follow-up appointment. (Tr. 228). Plaintiff reported that she had more pain all over her body and had stopped taking Neurontin. Dr. Chedid advised Plaintiff to resume taking Neurontin but stated that there was not much else that could be done. Dr. Chedid also stated that Plaintiff should go on disability because he did not think she could work. *Id.* A subsequent x-ray showed satisfactory alignment of Plaintiff's lower lumbar spine following insertion of implants at the L5-S1 level. (Tr. 240).

In May 2003 Dr. Imperial filled out a disability questionnaire for Plaintiff's insurance company. (Tr. 248-49). Dr. Imperial reported that due to her chronic back pain and fibromylagia, Plaintiff could: (1) stand/walk no more than 2 hours in an 8-hour workday; (2) minimally lift/carry up to 10 pounds; (3) minimally stoop, kneel, climb, ascend/descend stairs, push/pull, reach, or crawl; and (4) minimally use her neck. However, Dr. Imperial concluded that Plaintiff could use her hands for simple grasping, pushing/pulling, and fine manipulation.[2] (Tr. 249).

Plaintiff began treatment with Dr. Jeffrey Levin, a neurologist, in September 2003. (Tr. 266-67). Upon examination, Dr. Levin noted that Plaintiff had a positive Tinel's sign at both wrists with thenar weakness bilaterally and mild hypothenar right hand weakness. Plaintiff also demonstrated some weakness with shoulder abduction and some cervical paraspinal muscle spasms. (Tr. 266). A straight

---

[2]     The record contains Dr. Imperial's progress reports regarding his treatment of Plaintiff in 2000 through 2003. Dr. Imperial generally prescribed medication for Plaintiff's various medical conditions and referred her to specialists. (Tr. 275-93)

leg raising test was positive bilaterally.  Plaintiff had limited dorsiflexion and plantar flexion and decreased sensation in the S1 distribution to the right foot.  Dr. Levin tentatively diagnosed Plaintiff with lumbar radiculopathy, carpal tunnel syndrome, and cervical radiculopathy.  (Tr. 267).  After reviewing the EMG study, Dr. Levin confirmed his diagnosis of radiculopathy but not of carpal tunnel syndrome.  (Tr. 263-64).  An MRI taken of Plaintiff's lumbar spine was unremarkable and showed no focal disc herniation or canal stenosis.  (Tr. 344).

Plaintiff underwent an evaluation by Dr. Sanjeev Prakash for her fibromylagia.  Dr. Prakash noted that Plaintiff had tender trigger points that were consistent with fibromylagia.  (Tr. 256).  Dr. Prakash confirmed Plaintiff's diagnosis of fibromylagia.  He ordered further tests, prescribed new medication to replace Neurontin, and advised Plaintiff to exercise regularly to the extent that she was able.  (Tr. 257-60).  A subsequent test was negative for the rheumatoid factor and the Antinuclear Antibody, which are indicators of rheumatoid arthritis.  *See Stedman's Medical Dictionary* 645 (27th ed. 2000)(Tr. 261).

Records from 2004 and 2005 indicate that Plaintiff continued to experience back and neck pain.  She also reported migraine headaches, episodes of incontinence, and dizziness.  (Tr. 346-51, 379-81, 387-88).[3]

---

[3]     The records also contains reports from Plaintiff's chiropractor with whom she began treatment in 2004.  (Tr. 308-27).

IV.     **HEARING TESTIMONY**

A.     **Plaintiff's Testimony**

Plaintiff was 51 years old when she testified at the hearing.  (Tr. 407).  She had a high school education and had earned an associates degree in general education.  (Tr. 407-08).  Plaintiff testified that she stopped work in May 2001 due to her impairments.  She returned to work for one week but could not handle the pain.  According to Plaintiff, she had to kneel down and lie on the floor in- between people due to pain.  (Tr. 407).  Plaintiff told the ALJ that she could no longer check e-mail on the computer because she had back pain no matter how she propped her arms or sat down.  She also got headaches from moving her head.  (Tr. 409).  Plaintiff further testified that she could not grip anything with her left hand because her thumb was incorrectly positioned and she had pain whenever she used her dominant, right hand.  (Tr. 409-10).  She could not hold a pen or pencil with her left hand because she could not squeeze it.  (Tr. 410-11).  Plaintiff also testified that she could not open lids on jars and had difficulty manipulating buttons and zippers because she could not pinch with her left hand.  (Tr. 413-14).

Plaintiff testified that she could no longer pay bills or balance her checkbook because of neck pain and concentration difficulties.  (Tr. 411).  Plaintiff stated that she had neck pain looking downward and upward.  *Id.*  She also told the ALJ that she had "fibro-fog" as a result of her fibromyalgia even when not on medication, which made her feel like an "air-head."  (Tr. 412).

Plaintiff indicated that she took medication for her thyroid condition and her high blood pressure.  She also took an anti-depressant, Wellbutrin, steroids, Vicoprofen, muscle relaxers as needed, and various headache medications.  (Tr. 412-13).  Plaintiff testified that the Wellbutrin and

Paxil sedated her but did not lessen her pain.  She also had difficulty urinating and felt nauseous.
Other medications caused vomiting and weight gain.  (Tr. 407, 413).

To help relieve her pain, Plaintiff testified that she would lie on her back.  Although she was
instructed to lie on her stomach with her ankles on a pillow, the position hurt her neck.  (Tr. 415).
Plaintiff went to a chiropractor, which did not help much.  She cancelled appointments often
because she was in so much pain.  (Tr. 417).  Plaintiff estimated that she would lie down or rest for
about 4 hours in an 8-hour workday, could not remain in one position for very long due to the pain,
and could probably only lift a gallon of milk.  (Tr. 418).

When asked about her daily activities, Plaintiff testified that she could usually take care of her
personal needs such as grooming, bathing, and dressing.  Her husband occasionally helped her use
the bathtub.  She could not fix her hair on days when she could not lift her arms.  (Tr. 416).  When
Plaintiff did fix her hair, she had to sit on the floor and prop herself up in order to use a blow dryer.
Her arm would get tired halfway through drying her hair and she would be in so much pain that she
had to lie down and rest for an hour to recuperate.  *Id.*  Plaintiff testified that she did not do
household chores and left them for her parents to do when her husband was out of town.  *Id.*  She
had only cooked once in the last month.  She could not cook anything difficult or which required
her to stand for long.  If she boiled something to eat on the stove, she would lie down on the floor
to wait until it was ready.  *Id.*  Plaintiff stated that she drove to her chiropractor three times a week,
which was about 4 miles away from her home.  (Tr. 416-17).  Plaintiff indicated that she would go
out to lunch with her mother on occasion and that she and her husband ate dinner out regularly.
Plaintiff claimed that the last time she saw a movie she wound up on the floor due to pain.  (Tr.
418).

### B.      Vocational Expert's Testimony

Ms. Mary Williams, a vocational consultant, testified as an expert at the hearing.  (Tr. 419-23).  The ALJ asked Ms. Williams whether Plaintiff could perform her past, relevant work if Plaintiff's testimony regarding her limitations and impairments was found credible.  (Tr. 419).  Ms. Williams stated that Plaintiff could not perform such work or any other sedentary or light work based upon Plaintiff's testimony that she: (1) was required to lie down at least 4 hours in an 8-hour day; (2) could not sit or stand for very long; (3) was unable to lift more than a gallon of milk; and (4) experienced pain when using her arms or when looking forward or up.  (Tr. 419-20).

The ALJ then asked Ms. Williams to testify as to what jobs would be available to an individual of Plaintiff's age, education, and work experience who was limited to sedentary work with the following restrictions:  (1) sit/stand at-will option; (2) no repetitive bending, twisting, turning, pushing, pulling, gripping, or grasping; (3) no crawling, squatting, kneeling, or climbing; (4) no air or vibrating tools; (5) limited contact with the public; (6) no prolonged or repetitive rotation, flexion, or extension of the neck; and (7) use of left, non-dominant hand for guidance and support only.  (Tr. 420).  Ms. Williams testified that such an individual could perform work in the regional economy as a maintenance scheduler (1,890 jobs), a procurement clerk (1,150 jobs), and as an industrial order clerk (2,100 jobs).

Plaintiff's counsel asked Ms. Williams whether the listed jobs would be affected if the hypothetical individual described by the ALJ could only occasionally grip, grasp, handle with both hands, or otherwise only use both hands on an occasional basis.  (Tr. 421).  Ms. Williams testified that these jobs would be eliminated with these additional restrictions.  (Tr. 422).

## V.    LAW AND ANALYSIS

### A.    STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B.    FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1)     he was not presently engaged in substantial gainful employment; and

-10-

     (2)       he suffered from a severe impairment; and

     (3)       the impairment met or was medically equal to a "listed impairment;" or

     (4)       he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.

### C.   ANALYSIS

The ALJ found at step one of the sequential analysis that Plaintiff had not engaged in substantial gainful employment since her alleged onset date.  (Tr. 19).  At step two, the ALJ determined that Plaintiff had the following severe impairments: fibromylagia, status post lumbar fusion, lumbar and cervical radiculopathy, and a depressive disorder.  (Tr. 20).  The ALJ further found at step three that Plaintiff's documented impairments did not meet or medically equal any listed impairments.  *Id.*

At step four of the sequential analysis, the ALJ concluded that Plaintiff had the following RFC:

> Considering all of the evidence, it is reasonable to conclude that the claimant has the residual functional capacity to lift, carry, push and pull 10 pounds occasionally and less than 10 pounds frequently.  She is able to stand/walk 2 hours in an 8-hour work day and sit 6 hours in an 8-hour work day with a sit/stand option at will.  The claimant cannot perform work that requires repetitive bending, twisting or turning, or crawling, squatting, kneeling or climbing.  She cannot perform work that requires repetitive pushing or pulling, gripping or grasping and cannot use air or vibratory tools.  The claimant can

> only use her left (non-dominant) hand for guidance and support only [*sic*].
> She cannot perform tasks that require prolonged or repetitive rotation,
> flexion, or extension of the neck.  The claimant also needs the opportunity
> for a job with limited contact with the public.

(Tr. 23).  The ALJ thereafter concluded that Plaintiff's RFC precluded her from returning to her past,

relevant work.  *Id.*  Plaintiff raises no objections to the ALJ's findings made at steps one through four.

The burden shifted to Defendant at step five of the sequential analysis to demonstrate that

Plaintiff was capable of performing other work that existed in significant numbers in the national

economy.  To meet this burden, the ALJ relied upon the VE's testimony to conclude that Plaintiff was

not disabled because, given her age, education, work experience and RFC, Plaintiff could perform work

as a maintenance worker, procurement clerk, or industrial order clerk.  (Tr. 23-24).

Plaintiff contends that substantial evidence does not support the ALJ's step five determination

because the VE's testimony, upon which the ALJ relied, was premised upon an inaccurate hypothetical

that did not accurately portray Plaintiff's limited ability to use her hands for handling (gripping or

grasping).  The Sixth Circuit has held that "[s]ubstantial evidence may be produced through reliance on

the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question

accurately portrays [plaintiff's] individual physical and mental impairments." *Varley v. Sec'y of Health &*

*Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir.

1984)).

As noted above, the ALJ determined that Plaintiff could not perform any jobs that required

"repetitive" gripping or grasping.  He also limited her to work in which she would be required to use

her left, non-dominant hand for only guidance and support.  The word "repetitive" is not a term used

by the Social Security Administration to identify the frequency with which jobs require certain physical

-12-

activities to be performed.  Rather, the pertinent terms are constantly, frequently, and occasionally.  *See* U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ( "SCO") App. C, at C-3 (1993).[4]

The ALJ conveyed the above-listed limitations to the VE through the use of a hypothetical question.  The VE testified that a person with these limitations was capable of working as a maintenance scheduler (DOT[5] Code 221.367-066), procurement clerk (DOT Code 249.367-066), or industrial order clerk (DOT Code 221.367-022).  The jobs identified by the VE require "frequent" handling (gripping or grasping).  *See* U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ( "SCO") Pt. A, §§ 05.09.03, 07.05.01, 07.01.02, at 99, 325, 339; App. C, at C-3 (1993).  Furthermore, the VE testified that the jobs she identified would be eliminated if the hypothetical individual were limited to using both hands for only "occasional" handling.  The VE also stated that her testimony regarding the identified jobs was consistent with the DOT and its companion publications.  Given this information, the VE clearly understood the ALJ to use the term "repetitive" to mean "constantly".  The question is whether the VE's understanding was correct.

Plaintiff argues that the ALJ used the word "repetitive" to mean "frequently".  She therefore asserts that ALJ necessarily eliminated all jobs that would require handling more than "occasionally".  Plaintiff also asserts that the evidence of her diagnosis of fibromylagia, cervical and lumbar radiculopathy, and carpal tunnel syndrome supports a finding that she can only occasionally use her hands for handling.

---

[4]       These terms are defined as: (1) constantly = 2/3 or more of the time; (2) frequently = 1/3 to 2/3 of the time; and (3) occasionally = up to 1/3 of the time.  *SCO*, App. C, at C

[5]       "DOT" refers to the Dictionary of Occupational Titles.

However, a review of the record makes Plaintiff's argument untenable. Despite having impairments of fibromylagia and cervical and lumbar radiculopathy, none of Plaintiff's treating physicians noted any limitations in Plaintiff's ability to use her hands. Indeed, Dr. Imperial specifically noted in May 2003 that Plaintiff was not limited in this regard. The state agency physician also opined that Plaintiff had no manipulative limitations. Plaintiff also points to no evidence in the record in which any of Plaintiff's physicians tested or commented upon her ability to use her hands for specific functions such as handling, fingering, or feeling. Moreover, Plaintiff was able to work as an accounting assistant using her hands for many years despite her fibromylagia. (Tr. 60-61, 120, 408-09). There was also no indication in Plaintiff's disability application or daily activity questionnaires that an inability to use her hands resulted from her fibromylagia or spinal condition or prevented her from working. (Tr. 60-63, 82-99).

Furthermore, Plaintiff's suggestion that her carpal tunnel syndrome necessarily limited her to only occasional use of her hands is hard to fathom given that she has not challenged the ALJ's finding that this was not a medically proven impairment. (Tr. 20, 24). The ALJ wrote a detailed discussion of Plaintiff's subjective complaints regarding her limited ability to her left hand. (Tr. 21, 22). The ALJ noted, however, that although Plaintiff had tentatively been diagnosed Plaintiff with carpal tunnel syndrome in 2003, no EMG tests had confirmed this diagnosis.[6] *Id.* Considering this evidence, the ALJ

---

[6]     The ALJ and Plaintiff note that "Plaintiff had a positive Romberg's test consistent with carpal tunnel syndrome." (Tr. 21, 251). However, the Romberg sign relates to testing a person's equilibrium and has nothing to do with carpal tunnel syndrome. *See Stedman's Medical Dictionary* 1640.

Plaintiff also directs this Court's attention to evidence that was not before the ALJ at the time he rendered his decision. (Tr. 379-403). The Court may not rely upon this evidence to reverse the ALJ's decision. Moreover, Plaintiff has made no attempt to show that this new evidence is new or material or that she had good cause for failing to submit this evidence to the ALJ such that a remand would be appropriate. It was Plaintiff's burden to do so. *See Cline v. Comm'r of Soc. Sec.*, 96

nevertheless restricted Plaintiff to work that would not require her to use her left hand for anything other than guidance and support.  It is evident from the ALJ's lack of a discussion regarding Plaintiff's right hand that he did not believe that Plaintiff was anything more than minimally limited in her ability to use that hand.  The record provides substantial support for this position given the lack of any evidence that Plaintiff's treating physicians limited Plaintiff's use of either hand  or recommended any particular methods of treating Plaintiff's carpal tunnel syndrome, such as night splints, lidocaine injections, or surgery.  *See Carpal Tunnel Fact Sheet*, National Institute of Neurological Disorders and Stroke (2007), *available at* http://www.ninds.nih.gov/disorders/detail_carpal_tunnel.htm#82263049 (last modified February 12, 2007).  Based upon the record, the only reasonable conclusion is that the VE correctly understood the ALJ's use of the term "repetitive" to mean "constant" as it is the most minimally restrictive limitation available to him.  As such, the ALJ's non-disability determination is supported by substantial evidence.

The Court notes that it would have been infinitely more helpful for judicial review had the ALJ used the precise terms provided for by the regulations.  However, based on the record before us, a remand to address any error resulting from the ALJ's failure to do so would only be an "idle and useless formality."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (quoting *LLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n. 6 (1969)).

Plaintiff further contends that the ALJ's RFC finding that Plaintiff required a job with a sit/stand at-will option was inconsistent with his finding that Plaintiff could perform sedentary work, citing to Social Security Ruling ("SSR") 83-12.  Therefore, Plaintiff argues that the VE's

_____

F.3d 146, 148 (6th Cir. 1996).  Therefore, this evidence has not been considered by this Court.

-15-

testimony as to sedentary jobs that Plaintiff could perform in the regional economy fails to provide substantial evidentiary support for the ALJ's non-disability determination.

A sit/stand at-will option is appropriate for persons who are "not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work." SSR 83-12, 1983 WL 31253 *4. Typically, this limitation is accommodated by managerial or professional jobs and less frequently by unskilled, structured jobs. Therefore, "[i]n cases of unusual limitation of ability to sit or stand, a VS [vocational specialist] should be consulted to clarify the implications for the occupational base." *Ibid.* The ALJ adhered to SSR 83-12 and sought such testimony from the VE, thus "clarif[ying] the implications for the occupational base." Therefore, no error occurred. *See Sharp v. Barnhart*, 2005 WL 2811812, at *3 (6th Cir. 2005); *Wiergowski v. Comm'r of Social Sec.*, 1996 WL 520786, at *2 (6th Cir. 1996).

## VI.   RECOMMENDATION

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 10) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 9) should be **DENIED** and her Complaint **DISMISSED**.

## VII.   NOTICE TO THE PARTIES

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 26, 2007          s/ Mona K. Majzoub
                               MONA K. MAJZOUB
                               UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: March 26, 2007          s/ Lisa C. Bartlett
                               Courtroom Deputy